CHARLES J. McKEE (SBN 152458)
County Counsel
IRVEN L. GRANT, SBN 068950
Deputy County Counsel
JANET L. HOLMES, SBN 107639
County of Monterey
168 West Alisal Street, Third Floor
Salinas, California 93901-2653
Telephone: (831) 755-5045
Facsimile: (831) 755-5283
granti@co.monterey.ca.us

Attorneys for Defendants COUNTY OF MONTEREY, SHERIFF
STEVEL BERNAL, DEPUTY J. MENDOZA, OFFICER P.
SANCHEZ, DEPUTY WONG, and DEPUTY DOUGLAS RAARUP

## UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

San Jose Division

| | |
|---|---|
| BRANDON VILLARREAL, a minor, by and through his guardian ad litem, DONALD VILLARREAL and JAMES GREGORY, individually and as the Successor in Interest of the Estate of Larra Ann Gillis,<br><br>Plaintiffs,<br><br>vs.<br><br>COUNTY OF MONTEREY; SHERIFF STEVE BERNAL, in his individual and official capacity, DEPUTY J. MENDOZA; OFFICER P. SANCHEZ; DEPUTY WONG; DEPUTY DOUGLAS RAARUP; CALIFORNIA FORENSIC MEDICAL GROUP; TAYLOR FITHIAN, M.D.; LORI EDWARDS, R.N. and DOES 1 to 100, inclusive,<br><br>Defendants. | **CASE NO. 16-cv-06672 LHK**<br><br>**NOTICE OF MOTION AND MOTION FOR SUMMARY JUDGMENT BY DEFENDANTS COUNTY OF MONTEREY, SHERIFF STEVE BERNAL, DEPUTY J. MENDOZA, OFFICER P. SANCHEZ, DEPUTY WONG, DEPUTY DOUGLAS RAARUP ("Moving Defendants")**<br><br>Hearing Date: July 19, 2018<br>Hearing Time: 1:30 p.m.<br>Courtroom: 8, 4th Floor<br> 280 South First Street<br> San Jose, CA 95113 |

Villarreal v. County of Monterey, et al.
Motion for Summary Judgment or Partial Summary Judgment

Case No. 16-cv-06672 LHK

# TABLE OF CONTENTS

Table of Authorities ........................................................................................................ ii

**NOTICE OF MOTION AND MOTION FOR SUMMARY JUDGMENT** ..................................................................................................... 1

**MEMORANDUM OF POINTS AND AUTHORITIES** ................................................ 1

I.      **INTRODUCTION AND FACTUAL BACKGROUND SUMMARY** ........................... 1

II.     **LEGAL STANDARDS AND AUTHORITIES** ................................................ 3

     A.    Claims Under 42 U.S.C. §1983 ............................................................. 4

     B.    Qualified Immunity Precludes Liability Against Moving Defendants ................... 7

     C.    Failure to Summon Medical Care Under California Government Code §845.6 ... 10

     D.    State Law Negligent Supervision, Training, Hiring, and Retention ..................... 11

     E.    State Law Wrongful Death ................................................................. 13

     F.    General Negligence Claim Under State Law ............................................ 14

III.    **INDISPUTED FACTS SUPPORTING SUMMARY JUDGMENT** ........................... 14

     A.    Facts Pertinent to All Custody Defendants .............................................. 15

     B.    Deputy Jennifer Mendoza ................................................................. 16

     C.    Officer Pete Sanchez ....................................................................... 17

     D.    Deputy Wesley Wong ...................................................................... 18

     E.    Deputy Douglas Raarup .................................................................... 19

     F.    Sheriff Steve Bernal ........................................................................ 19

     G.    County of Monterey ........................................................................ 21

IV.    **CONCLUSION** ................................................................................ 23

# TABLE OF AUTHORITIES

Page

## Cases- Federal

*ACT UP!/ Portland v. Bagley,* 988 F.2d 868, 873 (9th Cir. 1993) ...............................................8

*Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986) .........................................................3

*Ashcroft v. al-Kidd,* 563 U.S. 731, 742 (2011) ............................................................................9

*Bell v. Wolfish,* 441 U.S. 520, 540, 547-48 (1979) ..................................................................7,12

*Brosseau v. Haugen,* 542 U.S. 194, 198-99 (2004) ......................................................................8

*C.A. v. William S. Hart Union High Sch. Dist.,* 53 Cal. 4th 861, 877 (2012)..............................11

*C.B. v. City of Sonora,* 769 F.3d 1005, 1026 (9th Cir. 2014) .......................................................9

*Celotex Corp. v. Catrett,* 477 U.S. 317, 323 (1986) ....................................................................3

*City and County of San Francisco v. Sheehan,* 135 S.Ct. 1765, 1775–1776 (2015) ....................9

*City of Canton v. Harris,* 489 U.S. 378, 385 (1989).....................................................................7

*City of Pomona v. SQM N. Am. Corp.,* 750 F.3d 1036, 1049 (9th Cir. 2014) ...............................3

*City of St. Louis v. Praprotnik,* 485 U.S. 112, 121, 108 S. Ct. 915, 99 L. Ed. 2d 107 (1988).........7

*Clement v. Gomez,* 298 F.3d 898, 904 (9th Cir. 2002) .................................................................5

*Clouthier v. County of Contra Costa,* 591 F.3d 1232, 1245 n.3 (9th Cir. 2010) .......................6,8

*Cnty. Of Sacramento v. Lewis,* 523 U.S. 833, 846 (1998).............................................................5

*Conn v. City of Reno,* 591 F.3d 1081, 1094 (9th Cir. 2009), *vacated,* 131 S. Ct. 1812 (2011), *reinstated in part and vacated in part,* 658 F.3d 897 (9th Cir. 2011) .............................................4

*Curnow ex rel. Curnow v. Ridgecrest Police,* 952 F.2d 321, 325 (9th Cir. 1991)) ........................4

*Davis v. Scherer,* 466 U.S. 183, 184 S. Ct. 3012, 3020 (1984) ....................................................9

*Devereaux v. Abbey,* 263 F.3d 1070, 1074 (9th Cir. 2001) ..........................................................8

*Estate of Prasad v. County of Sutter,* 958 F. Supp. 2d 1101, 1118 (E.D. Cal. 2013)...................13

*Estelle v. Gamble,* 429 U.S. 97, 106 (1976) ................................................................................4

*Farmer v. Brennan,* 511 U.S. 825, 832 (1994) .......................................................................4,5,7

*Foster v. Runnels,* 554 F.3d 807, 812 (9th Cir. 2009) ..................................................................5

*Gagne v. Galveston,* 805 F.2d 558 (5th Cir. 1986)......................................................................9

ii

*Gibson v. County of Washoe,* 290 F.3d 1175, 1185 (9th Cir. 2002)........................7

*Hernandez v. Cty. of Monterey,* N.D. Cal. Case. No. 13-cv-2354-PSG ..........12, 15, 20, 21, 22, 23

*Hudson v. McMillian,* 503 U.S. 1, 4 (1992)........................4

*Hunter v. Bryant,* 502 U.S. 224, 229 (1991)........................8

*Jeffers v. Gomez,* 267 F.3d 895, 910 (9th Cir. 2001)........................8

*Jett v. Penner,* 439 F.3d 1091, 1096 (9th Cir. 2006).........................4

*Keenan v. Allan,* 91 F.3d 1275, 1279 (9th Cir. 1996) ........................3

*Kisela v. Hughes,* No. 17-467, 2018 WL 1568126, at *2 (U.S. Apr. 2, 2018) ........................9

*L.A. Police Protective League v. Gates,* 907 F.2d 879, 889 (9th Cir. 1990) ........................7

*Labatad v. Corr. Corp. of Am.,* 714 F.3d 1155, 1160 (9th Cir. 2013)........................5

*Lemire v. California Dep't of Corr. & Rehab.,* 726 F.3d 1062, 1074 (9th Cir. 2013) ..........5,6,14

*McGuckin v. Smith,* 974 F.2d 1050, 1059–60 (9th Cir. 1992)........................5

*Malley v. Briggs,* 475 U.S. 335, 343 (1986) ........................8

*Mitchell v. Forsyth,* 472 U.S. 511, 526 (1985)........................8

*Monell v. Dep't of Soc. Servs.,* 436 U.S. 658, 694, 98 S. Ct. 2018, 56 L. Ed. 2d 611 (1978)....7,24

*Moreland v. Las Vegas Metro. Police Dep't,* 159 F.3d 365, 371 (9th Cir. 1998)........................4

*Nissan Fire & Marine Ins. Co., Ltd. v. Fritz Cos., Inc.,* 210 F.3d 1099, 1102 (9th Cir. 2000) ........................3

*Parenti v. County of Monterey,* 2018 U.S. Dist. LEXIS 59352 (N. D. Cal. April 6, 2018) ..........5

*Pearson v. Callahan,* 555 U.S. 223, 231 (2009)........................7,8

*Plumhoff v. Ricard,* 134 S.Ct. 2012, 2023 (2014) ........................9

*Porter v. Osborn,* 546 F.3d 1131, 1137 (9th Cir. 2008) ........................5

*Redman v. County of San Diego,* 942 F.2d 1435, 1441 (9th Cir. 1991)........................4,7

*Saucier v. Katz,* 533 U.S. 194, 201-02 (2001) ........................8

*Sharp v. County of Orange,* No. 15-56146, 2017 WL 4126947, at *7 (9th Cir. Sept. 19, 2017)....9

*Simmons v. Navajo Cnty., Ariz.,* 609 F.3d 1011, 1017 (9th Cir. 2010) ........................9

*Starr v. Baca ,* 652 F.3d 1202, 1205-08 (9th Cir. 2011)) ........................14

*Toguchi v. Chung,* 391 F.3d 1051, 1060 (9th Cir. 2004) ........................6

iii

*Thomas v. Ponder*, 611 F.3d 1144, 1150-51 (9th Cir. 2010) ...................................................6

*Watkins v. City of Oakland*, 145 F.3d 1087, 1093 (9th Cir. 1998) ..........................................6

*Wilkinson v. Torres*, 610 F.3d 546, 554 (9th Cir. 2010) ..........................................................4

*Wilson v. Seiter*, 501 U.S. 294, 298 (1991) ...............................................................................6

*Wilson v. Layne*, 526 U.S. 603, 614 (1999) ...............................................................................8

*Willis v. County of Sacramento*, 2014 U.S. Dist. LEXIS 33900 (E.D. Cal. Mar. 11, 2014) .........11

*White v. Pauly*, 137 S. Ct. 548, 551 (2017) ............................................................................8, 9

*White v. Roper*, 901 F.2d 1501, 1505 (9th Cir. 1990) ..............................................................6

*WMX Techs., Inc. v. Miller*, 104 F.3d 1133 (9th Cir. 1997) .....................................................5

### Cases- State

*Benavidez v. San Jose Police Dept.*, 71 Cal. App. 4th 853, 865 (1999).................................14

*Castaneda v. Department of Corrections & Rehabilitation*, 212 Cal. App. 4th 1051, 1070 (2013), *review denied* (May 1, 2013) ..............................................................................10, 13

*Lucas v. City of Long Beach*, 60 Cal. App. 3d 341, 349 (1976) ..............................................10

*Lucas v. Cty. of Los Angeles*, 47 Cal. App. 4th 277, 288 (1996).............................................10

*Norgart v. Upjohn Co.*, 21 Cal.4th 383, 390 (1999) ...............................................................13

*Sava v. Fuller*, 249 Cal. App. 281 (1967).................................................................................11

*Watson v. State of California*, 21 Cal.App.4th 836, 841 (1993).......................................10,11,13

### Statutes- Federal

42 U.S.C.
     Section 1983 ...........................................................................................................1, 4, 5, 7

### Statutes- State

California Government Code
     Section 810 ......................................................................................................................11
     Section 815 ......................................................................................................................11
     Section 820 ......................................................................................................................11
     Section 844.6 ...................................................................................................................11
     Section 845.2 ...................................................................................................................11
     Section 845.4 ...................................................................................................................11
     Section 845.6 .............................................................................................1, 10, 11, 13, 14
     Section 855.6 ...................................................................................................................13

California Civil Procedure
     Code 377.60 .....................................................................................................................13

iv

1          **NOTICE OF MOTION AND MOTION FOR SUMMARY JUDGEMENT**

2       **TO:**      **ALL PARTIES AND THEIR ATTORNEYS OF RECORD:**

3         Defendants County of Monterey, Sheriff Steve Bernal, Deputy J. Mendoza, Officer P.

4 Sanchez, Deputy Wong and Deputy Raarup ("Moving Defendants") give notice of this motion

5 for summary judgement, filed pursuant to Federal Rule of Civil Procedure 56, and set for hearing

6 before this court July 19, 2018, at 1:30 p.m. in Department 8 of the above-reference court located

7 at 280 South First Street, San Jose, California, the Honorable District Judge Lucy H. Koh.

8 By this motion, Moving Defendants seek summary judgment on each and every cause of action

9 asserted against them in Plaintiffs' Complaint in the action, on grounds that the undisputed facts

10 establish that no liability can attach on any grounds asserted by Plaintiffs in their Complaint.

11 Specifically, Moving Defendants seek adjudications in their favor on all causes of action asserted

12 against them: the enumerate second, third, fourth, fifth, seventh, tenth and eleventh causes of

13 action.

14            **MEMORANDUM OF POINTS AND AUTHORITIES**

15     **I.**      **INTRODUCTION AND FACTUAL BACKGROUND SUMMARY**

16         This lawsuit arises out of the death of Laura Gillis on December 19, 2015 at Natividad

17 Medical Center. ECF 1, ¶1. Prior to her hospitalization, Ms. Gillis had been arrested and

18 detained for approximately 28 hours December 4 to 5, 2018 at the Monterey County Jail.

19 Sievers Dec. ¶8, Ex. B. Plaintiffs are two of decedent's three children. Moving Defendants are

20 the County of Monterey and five employees of its Sheriff's department (including its elected

21 Sheriff Steve Bernal). Plaintiffs assert seven of the Complaint's enumerated causes of action

22 against Moving Defendants: (2) 42 U.S.C. § 1983—failure to provide medical care in violation

23 of the Fourteenth Amendment, (3) 42 U.S.C. § 1983—failure to protect in violation of the

24 Fourteenth Amendment. (4) 42 U.S.C. § 1983—deprivation of substantive due process rights in

25 violation of the First and Fourteenth Amendments, (5) Failure to Summon Medical Care in

26 violation of Cal. Gov't Code § 845.6, (7) Negligent Supervision, Training, Hiring, and Retention

27 (against the County and Bernal only), (10)   Wrongful Death, and (11) Negligence. ECF 78,

28 pp.7-8, 38.

1    On December 4, 2015, CSUMB police department Officer Leland responded to a call

2    reporting that Gillis was walking in and out of traffic in Marina, California.  ECF No. 1 ¶ 54–55.

3    After Leland arrived on the scene, Leland attempted to grab Gillis's arm, but Gillis ran away. *Id.*

4    ¶ 55. Leland called CSUMB police department Corporal Peliova and CSUMB police department

5    Corporal Andrada and informed them where they could find Gillis. *Id.* After Peliova and

6    Andrada found Gillis, Andrada grabbed Gillis's arm and attempted to put her hands behind her

7    back. *Id.* ¶ 57. However, Andrada was not successful and therefore Andrada tripped Gillis, who

8    fell to the ground. *Id.* Peliova then handcuffed Gillis while Gillis was face down on the ground.

9    *Id.* ¶ 58.  Gillis was then placed in the back of a patrol vehicle, and transported to Monterey

10   County Jail, where Gillis was booked at 8:15 a.m. *Id.* ¶¶ 60–61.

11   On arrival at the Monterey County jail, Ms. Gillis was combative, belligerent, and

12   resisted officers' efforts.  Mendoza, Wong Decs. ¶¶6.  Gillis tried to escape as she was

13   removed from the CSUMB vehicle in the Monterey County Jail sally port.  Because Ms. Gillis

14   was combative at booking and had tried to escape, she placed in a safety cell, for the safety of

15   herself and others. Mendoza Dec. ¶6; Sanchez Dec. ¶8.  Ms. Gillis was checked frequently, at

16   least twice every thirty minutes by custody staff in accord with policy.

17   In addition, Ms. Gillis was assessed repeatedly by health care professionals employed

18   by Defendant California Forensics Medical Group (CFMG).  CFMG medical staff were

19   stationed and on duty at all times on December 4 through 5, 2015, in the Intake/Receiving

20   area where Ms. Gillis' safety cell was located.  Mendoza Dec. ¶3, Wong Dec. ¶3, Sanchez

21   Dec. ¶3. In total, custody staff checked on Ms. Gillis at least 193 times between her arrival at

22   8:12 a.m. on December 4, 2015, and her being found in distress at 12:09 p.m. on December 5,

23   2015.   Moreover, CFMG medical staff checked Ms. Gillis at least twenty times, and noted at

24   least five times on the custody Safety Cell Log in the "Medical Assessment" section, their

25   recommendations that she be "maintain[ed]".   Notably, at 11:30 a.m. December 5, 2015

26   (approximately 40 minutes before Ms. Gillis was found in distress) CFMG Registered Nurse

27   Neiman's Medical Assessment "Recommendation" on the Safety Cell Log was to "maintain."

28   Sievers Dec. Ex. C, p. 5 (middle of pages).  By 12:19 p.m. two nurses and ambulance staff

2

1  were treating Ms. Gillis, and preparing her for transport to the hospital. Sievers Dec. Ex. B,
2  p.6, Ex. C, p.5.

3        The undisputed evidence demonstrates that in addition to the 193 custody officer checks
4  and independent CFMG medical attention provided, custody repeatedly provided food and water
5  to Ms. Gillis during her stay at the jail. Sievers Dec. Ex. ¶¶5, 6, 9, 10, 11.

6        A more detailed account of the facts supporting this motion on behalf of each Moving
7  Defendant is provided in Section III below.

8  **I.   LEGAL STANDARDS AND AUTHORITIES**

9        "A party is entitled to summary judgment if the 'movant shows that there is no genuine
10  dispute as to any material fact and the movant is entitled to judgment as a matter of law.'" *City of*
11  *Pomona v. SQM N. Am. Corp.*, 750 F.3d 1036, 1049 (9th Cir. 2014) (quoting Fed. R. Civ. P.
12  56(a)). Material facts are those that may affect the outcome of the case. *Anderson v. Liberty*
13  *Lobby, Inc.*, 477 U.S. 242, 248 (1986). A genuine dispute of material fact exists if there is
14  sufficient evidence for a reasonable jury to return a verdict for the nonmoving party. *Id.* at 248–
15  49.

16        The party moving for summary judgment bears the initial burden of informing the court
17  of the basis for the motion, and identifying portions of the pleadings, depositions, answers to
18  interrogatories, admissions, or affidavits that demonstrate the absence of a triable issue of
19  material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). To meet its burden, "the
20  moving party must either produce evidence negating an essential element of the nonmoving
21  party's claim or defense or show that the nonmoving party does not have enough evidence of an
22  essential element to carry its ultimate burden of persuasion at trial." *Nissan Fire & Marine Ins.*
23  *Co., Ltd. v. Fritz Cos., Inc.*, 210 F.3d 1099, 1102 (9th Cir. 2000).

24        If the moving party meets its initial burden, the burden shifts to the nonmoving party to
25  produce evidence supporting its claims or defenses. *Id.* at 1103. If the nonmoving party does not
26  produce evidence to show a genuine issue of material fact, the moving party is entitled to
27  summary judgment. *Celotex*, 477 U.S. at 323. It is not the task of the Court to scour the record in
28  search of a genuine issue of triable fact. *Keenan v. Allan*, 91 F.3d 1275, 1279 (9th Cir. 1996).

3

## A. Claims Under 42 U.S.C. §1983

Plaintiffs' second, third and fourth causes of action are asserted against Moving Defendants under 42 U.S.C. §1983. Plaintiffs assert defendants (a) failed to provide medical care, (b) failed to protect and (c) violated substantive due process rights, each amounting to a constitutional violation. Jail officials have an affirmative duty to "ensure that inmates receive adequate food, clothing, shelter, and medical care." *Farmer v. Brennan*, 511 U.S. 825, 832 (1994). Custody officials violate their affirmative duty by "acting or failing to act with deliberate indifference to a substantial risk of serious harm to a prisoner..." *Id.* at 836. "The Eighth Amendment protects inmates from cruel and unusual punishment, which includes the denial of medical care." *Conn v. City of Reno*, 591 F.3d 1081, 1094 (9th Cir. 2009), *vacated*, 131 S. Ct. 1812 (2011), *reinstated in part and vacated in part*, 658 F.3d 897 (9th Cir. 2011). The Eighth and Fourteenth Amendments both guarantee that inmates and detainees receive constitutionally adequate medical care. *Id, Simmons v. Navajo County*, 609 F.3d 1011, 1017 (2010); *Redman v. County of San Diego*, 942 F.2d 1435, 1441 (9th Cir. 1991).

Plaintiffs' burden with regard to their three separate section 1983 claims are largely the same, although different analyses have been articulated by the courts. First, to bring a valid section 1983 claim for a violation of Ms. Gillis' constitutional rights based on inadequate medical care, Plaintiffs must show that Moving Defendants' acts or omissions were "sufficiently harmful to evidence deliberate indifference to serious medical needs." *Estelle v. Gamble*, 429 U.S. 97, 106 (1976); *Hudson v. McMillian*, 503 U.S. 1, 4 (1992); *Jett v. Penner*, 439 F.3d 1091, 1096 (9th Cir. 2006). Second, in a failure to protect claim, an inmate satisfies the "sufficiently serious deprivation" requirement by "show[ing] that he is incarcerated under conditions posing a substantial risk of serious harm." *Farmer*, 511 U.S. at 834. Third, a Fourteenth Amendment substantive due process claim may arise if children are deprived of their liberty interest in the companionship and society of their parent through improper official conduct. *Wilkinson v. Torres*, 610 F.3d 546, 554 (9th Cir. 2010) (citing *Curnow ex rel. Curnow v. Ridgecrest Police*, 952 F.2d 321, 325 (9th Cir. 1991)); *see also Moreland v. Las Vegas Metro. Police Dep't*, 159 F.3d 365, 371 (9th Cir. 1998). "[O]nly official conduct that 'shocks the conscience' is cognizable

4

1  as a due process violation." *Porter v. Osborn*, 546 F.3d 1131, 1137 (9th Cir. 2008) (quoting

2  *Cnty. of Sacramento v. Lewis*, 523 U.S. 833, 846 (1998)).  Ultimately, all three §1983 claims

3  against Moving Defendants revolve around allegations of failure to summon medical care;

4  therefore, the legal analysis is uniform.

5       The determination of "deliberate indifference" in the failure to summon medical care

6  context involves an examination of two elements: the seriousness of the inmate's medical need

7  and the nature of the defendant's response to that need. *See McGuckin v. Smith*, 974 F.2d 1050,

8  1059–60 (9th Cir. 1992), *overruled in part on other grounds by WMX Techs., Inc. v. Miller*, 104

9  F.3d 1133 (9th Cir. 1997) (en banc). A jailer is deliberately indifferent if she or he knows that a

10  prisoner faces a substantial risk of serious harm and disregards that risk by failing to take

11  reasonable steps to abate it. *Farmer*, 511 U.S. at 837. In *Farmer*, the Supreme Court held the

12  jailer must not only "be aware of facts from which the inference could be drawn that a

13  substantial risk of serious harm exists," but he or she "must also draw the inference." *Id*.  Thus,

14  the deliberate indifference standard has both an objective and a subjective component. *See*

15  *Clement v. Gomez*, 298 F.3d 898, 904 (9th Cir. 2002); *see also Labatad v. Corr. Corp. of Am.*,

16  714 F.3d 1155, 1160 (9th Cir. 2013). Put another way a plaintiff alleging deliberate indifference

17  must first "objectively show that [the inmate] was deprived of something 'sufficiently serious.'"

18  *Lemire v. California Dep't of Corr. & Rehab.*, 726 F.3d 1062, 1074 (9th Cir. 2013) (quoting

19  *Foster v. Runnels*, 554 F.3d 807, 812 (9th Cir. 2009)). "A deprivation is sufficiently serious

20  when the prison official's act or omission results 'in the denial of the minimal civilized measure

21  of life's necessities.'" *Id*. (quoting *Farmer*, 511 U.S. at 834). Next, the plaintiff must "make a

22  subjective showing that the deprivation occurred with deliberate indifference to the inmate's

23  health or safety." *Lemire*, 726 F.3d at 1074. To satisfy the subjective component of deliberate

24  indifference, Plaintiffs must show that Moving Defendants "knew of and disregarded" the

25  substantial risk of harm. *Id.; see also Parenti v. County of Monterey*, 2018 U.S. Dist. LEXIS

26  59352 (N. D. Cal. April 6, 2018).

27  / / /

28  / / /

5

The indifference to a prisoner's medical needs must be substantial to satsify the deliberate indifference component. Mere indifference, negligence, medical malpractice or even gross negligence is insufficient to establish deliberate indifference to serious medical needs. *Lemire*, 726 F.3d at 1081-82.; *see Farmer*, 511 U.S. at 835–36 & n.4 (recognizing that neither negligence nor gross negligence will constitute deliberate indifference). "Deliberate indifference is a high legal standard." *Toguchi v. Chung*, 391 F.3d 1051, 1060 (9th Cir. 2004). The Supreme Court has explained that it is "fair to say that acting or failing to act with deliberate indifference to a substantial risk of serious harm to a prisoner is the equivalent of recklessly disregarding that risk." *Farmer*, 511 U.S. at 836. Liability may be avoided entirely by presenting evidence that the defendant lacked knowledge of the risk and/or that his response was reasonable in light of all the circumstances. *Farmer*, 511 U.S. at 844-45; see also, *Wilson v. Seiter*, 501 U.S. 294, 298 (1991); *Thomas v. Ponder*, 611 F.3d 1144, 1150-51 (9th Cir. 2010). Where, as here, officers reasonably relied on the expertise of on-site medical professionals, and had no knowledge of any serious medical condition requiring immediate attention, the officers were not deliberately indifferent to an inmate's needs. *Lemire*, 726 F.3d at 1084.

In addition, Plaintiffs must demonstrate that Moving Defendants' constitutional violations were both an actual and proximate cause of Ms. Gillis' injuries, which Plaintiffs cannot do here. *See Conn*, 591 F.3d at 1098–1101; *see also Clouthier v. County of Contra Costa*, 591 F.3d 1232, 1245 n.3 (9th Cir. 2010) (citing *White v. Roper*, 901 F.2d 1501, 1505 (9th Cir. 1990)); *Lemire*, 726 F.3d at 1074.

With respect to Sheriff Steve Bernal, who was not present during any of the events at issue, "[a] supervisor can be liable in his individual capacity for his own culpable action or inaction in the training, supervision, or control of his subordinates; for his acquiescence in the constitutional deprivation; or for conduct that showed a reckless or callous indifference to the rights of others." *Id.* at 1208 (quoting *Watkins v. City of Oakland*, 145 F.3d 1087, 1093 (9th Cir. 1998)). Additionally, "[s]upervisory liability exists even without overt personal participation in the offensive act if supervisory officials implement a policy so deficient that the policy itself is a repudiation of constitutional rights and is the moving force of the constitutional violation."

6

1   *Redman v. Cnty. San Diego*, 942 F.2d 1435, 1446 (9th Cir. 1991), *abrogated on other grounds*

2   *by Farmer v. Brennan*, 511 U.S. 825 (1994).

3        With respect to the *Monell* claims against Defendant County of Monterey, a municipality

4   may be held liable on a section 1983 claim only when the municipality inflicts an injury, and it

5   may not be held liable under a respondeat superior theory. *Gibson v. County of Washoe*, 290 F.3d

6   1175, 1185 (9th Cir. 2002) (citing *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 694 (1978)). In

7   considering whether a municipality itself violated a person's rights or directed its employee to do

8   so, the focus is on the municipality's "policy statement, ordinance, regulation, or decision

9   officially adopted and promulgated by that body's officers." *City of St. Louis v. Praprotnik,* 485

10   U.S. 112, 121 (1988) (quoting *Monell,* 436 U.S. at 690). Such a practice can either be an official

11   municipal policy or merely a pervasive custom (*L.A. Police Protective League v. Gates,* 907 F.2d

12   879, 889 (9th Cir. 1990)), and liability will arise only if a plaintiff can demonstrate both that a

13   constitutional deprivation occurred and that the municipality was the "moving force behind the

14   injury alleged." *City of Canton v. Harris,* 489 U.S. 378, 385 (1989). In other words, the

15   "identified deficiency" in the municipality's policies must be "closely related to the ultimate

16   injury." *Id*, at 391. To the extent Plaintiffs claim safety cell placement is a constitutional

17   deprivation, in *Anderson v. County of Kern,* 45 F.3d 1310 (9th Cir. 1995), the Ninth Circuit

18   noted that some detainees and/or inmates became so violent and such a danger to themselves

19   "that temporary placement in a safety cell was needed in order to deprive the prisoners of all

20   means of harming themselves." *Id*, at 1314. Courts ordinarily defer to the judgments and

21   professional expertise of corrections officials on matters related to corrections institution

22   policies, including those related to cell placement. *See Bell v. Wolfish,* 441 U.S. 520, 540, 547-48

23   (1979).

24

25      **B.  Qualified Immunity Precludes Liability Against Moving Defendants**

26        The doctrine of qualified immunity protects government officials from liability for

27   civil damages insofar as their conduct does not violate clearly established statutory or

28   constitutional rights of which a reasonable person would have known. *Pearson v. Callahan*,

1  555 U.S. 223, 231 (2009). This standard protects "'all but the plainly incompetent or those

2  who knowingly violate the law'" (*Hunter v. Bryant,* 502 U.S. 224, 229 (1991) (per curiam)

3  (quoting *Malley v. Briggs,* 475 U.S. 335, 343 (1986)), and provides ample room for mistaken

4  judgments. *Jeffers v. Gomez,* 267 F.3d 895, 910 (9th Cir. 2001). The court's qualified

5  immunity analysis is "essentially legal" and is appropriately made on summary judgment

6  where the underlying facts are undisputed. *ACT UP!/ Portland v. Bagley,* 988 F.2d 868, 873

7  (9th Cir. 1993). Because qualified immunity is "an immunity from suit rather than a mere

8  defense to liability . . . it is effectively lost if a case is erroneously permitted to go to trial."

9  *Mitchell* v. *Forsyth,* 472 U.S. 511, 526 (1985).

10        On an assertion of qualified immunity, a two-part test applies: first, the court

11  determines whether the law that governs the official's conduct was clearly established; second,

12  the court considers whether a reasonable officer could have believed the conduct was lawful.

13  *Saucier v. Katz,* 533 U.S. 194, 201-02 (2001). Whether a right is clearly established turns on

14  the "objective legal reasonableness of the action, assessed in light of the legal rules that were

15  clearly established at the time it was taken." *Clouthier,* 591 F.3d at 1241, citing *Pearson,* 555

16  U.S. at 243 (quoting *Wilson v. Layne,* 526 U.S. 603, 614 (1999)). "The relevant, dispositive

17  inquiry in determining whether a right is clearly established is whether it would be clear to a

18  reasonable officer that his conduct was unlawful in the situation he confronted." *Brosseau v.*

19  *Haugen,* 542 U.S. 194, 198-99 (2004). If an official could reasonably have believed his

20  actions were legal in light of clearly established law and the information he possessed at the

21  time, he is protected by qualified immunity. *Saucier,* 533 U.S. at 202; *Devereaux v. Abbey,*

22  263 F.3d 1070, 1074 (9th Cir. 2001) (en banc).

23        "Because the focus is on whether the officer had fair notice that her conduct was

24  unlawful, reasonableness is judged against the backdrop of the law at the time of the conduct."

25  *Brosseau v. Haugen,* 543 U.S. 194, 198 (2004). Although the Supreme Court "does not

26  require a case directly on point for a right to be clearly established, existing precedent must

27  have placed the statutory or constitutional question beyond debate." *White v. Pauly,* 137 S. Ct.

28  548, 551 (2017) (internal quotation marks omitted). The Supreme Court has consistently held

8

that clearly established law should not be defined at a high level of generality. *See Kisela v. Hughes*, No. 17-467, 2018 WL 1568126, at *2 (U.S. Apr. 2, 2018) (quoting *City and County of San Francisco v. Sheehan,* 135 S.Ct. 1765, 1775–1776 (2015)); *see also White*, 137 S. Ct. at 552 (quoting *Ashcroft v. al-Kidd*, 563 U.S. 731, 742 (2011)). Rather, clearly established law must be "particularized" to the facts of the case, otherwise the analysis "avoids the crucial question whether the official acted reasonably in the particular circumstances that he or she faced." *Plumhoff v. Ricard*, 134 S.Ct. 2012, 2023 (2014). An officer "cannot be said to have violated a clearly established right unless the right's contours were sufficiently definite that any reasonable official in the defendant's shoes would have understood that he was violating it." *Id.;* see also, *C.B. v. City of Sonora*,  769 F.3d 1005, 1026 (9th Cir. 2014).

The Ninth Circuit is clear that the burden is on the *plaintiff* to point to case law indicating that the right allegedly violated was clearly established. "Except in the rare case of an 'obvious' instance of constitutional misconduct…Plaintiffs must *identify a case* where an officer acting under similar circumstances as [the defendant officer] was held to have violated the Fourth Amendment." *Sharp v. County of Orange*, No. 15-56146, 2017 WL 4126947, at *7 (9th Cir. Sept. 19, 2017) (emphasis in original) (quoting *White*, 137 S .Ct. at 552). The preexisting law identified must also be "controlling—from the Ninth Circuit or Supreme Court—or otherwise be embraced by a consensus of courts outside the relevant jurisdiction." *Id*. Moving defendants submit there is no clearly established law requiring custody deputies to summon additional medical care when a detoxing inmate housed in a safety cell is being assessed by medical staff on a regular basis, and the deputies check the inmate (Ms. Gillis) on average even nine minutes during her brief stay at the jail (193 times in 28 hours). *See* Sievers Dec. ¶9.

Moreover, the Supreme Court has ruled that law enforcement officers sued for constitutional violations will not lose qualified immunity merely because their conduct may violate some statutory or administrative provision. *Davis v. Scherer*, 466 U.S. 183, 184 S. Ct. 3012, 3020 (1984).  Thus, even violation of a departmental regulation or policy would not, by itself, preclude qualified immunity. *Gagne v. Galveston*, 805 F.2d 558 (5th Cir. 1986).

9

1    Thus, in the case at bar, even if a triable issue exists as to a constitutional violation by

2  Moving Defendants, qualified immunity shields them from liability if a similarly-situated law

3  enforcement officer could have reasonably believed the actions taken were legal in light of

4  clearly established law and the information possessed at the time.

5                   **C.    Failure to Summon Medical Care Under California Government Code**

6                   **§845.6**

7         "Liability of public entities and public employees under Government Code section

8  845.6 is limited to serious and obvious medical conditions requiring immediate care." *Lucas*

9  *v. Cty. of Los Angeles*, 47 Cal. App. 4th 277, 288 (1996) (citing *Watson v. State of California*,

10  21 Cal.App.4th 836, 841 (1993)). Under California law, the duty of public entities and

11  officials to provide medical care to prisoners is limited to "cases where there is *actual or*

12  *constructive knowledge* that the prisoner is in need of *immediate* medical care." *Id.* This is an

13  objective standard. *Id.*  California courts have narrowly interpreted section 845.6 to create

14  limited liability when: (1) the public employee "knows or has reason to know of the need," (2)

15  of "immediate medical care," *and* (3) "fails to take reasonable action to summon such

16  medical care." *Castaneda v. Department of Corrections & Rehabilitation*, 212 Cal. App. 4th

17  1051, 1070 (2013), *review denied* (May 1, 2013).  Section 845.6 does not impose a duty to

18  monitor the quality of care provided. *Watson,* 21 Cal.App. 4th at 843.  Custody officers "do

19  not have the medical training to know whether a prisoner's medical condition has been

20  properly diagnosed and treated." *Id.*  "[S]ection 845.6 creates out of the general immunity a

21  limited cause of action against a public entity for its employees' failure to *summon* immediate

22  medical care only. . . . The statute does not create liability of the public entity for malpractice

23  in furnishing or obtaining that medical care." *Castaneda*, 212 Cal. App. 4th at 1070 (emphasis

24  in original).

25         Section 845.6 is cast in the form of immunity which is absolute except for the situation

26  of a failure to provide medical care for a prisoner in obvious need of such care. *Lucas v. City*

27  *of Long Beach*, 60 Cal. App. 3d 341, 349 (1976).  Here, as demonstrated is the undisputed

28  evidence, CFMG medical staff and care were on duty at all times in the receiving unit where

10

Ms. Gillis was housed, and indeed medical staff checked on Ms. Gillis repeatedly; therefore, there can be no liability under section 845.6. CFMG health care professionals, who checked on Ms. Gillis at least 20 times during her stay in the Intake/Receiving area safety cell, did not conclude that Ms. Gillis needed additional medical attention; thus, custody law enforcement officers should not be presumed to have expertise and knowledge to override those medical assessments. *Watson*, 21 Cal.App.4th at 843. Indeed, the custody Safety Cell Log "Medical Assessment" by Registered Nurse Neiman at 11:30 a.m. December 5 (approximately 40 minutes before she was found in distress) included her "Recommendation" to "maintain." Sievers Dec. Ex. C, p. 5 (middle of page).

## D. State Law Negligent Supervision, Training, Hiring, and Retention

Plaintiffs' seventh claim for relief is brought under California state law against the County of Monterey and Sheriff Steve Bernal. The effect of the California Government Claims Act (Cal. Gov. Code §810, et seq.) is to reverse the common law formula that "when there is negligence, the rule is liability." Instead, under Government Code sections 815 and 820, *et seq.*, immunity becomes the rule, and Plaintiffs must identify exceptions thereto set forth in the Government Code. *Sava v. Fuller*, 249 Cal. App. 281 (1967). By way of example, an arrestee's claim of negligent hiring, supervision, and retention against a county were properly dismissed under these statutes where the arrestee did not identify a statute creating liability for a public entity. *Willis v. County of Sacramento*, 2014 U.S. Dist. LEXIS 33900 (E.D. Cal. Mar. 11, 2014). Absent a special relationship, there can be no individual liability to third parties for negligent hiring, retention or supervision of a fellow employee, and hence no vicarious liability. *C.A. v. William S. Hart Union High Sch. Dist.*, 53 Cal. 4th 861, 877 (2012). Moreover, the immunities set forth at Government Code sections 844.6, 845.2, 845.4, and 845.6 specifically preclude liability.

As set forth in the Declarations of Sheriff Bernal and Captain Bass, the County took significant steps to improve the quality of health care and services provided to inmates during the year preceding Ms. Gillis' instant incarceration. In February 2015, the CFMG contract was expanded to provide, among other things, around-the-clock ("24/7") health care professionals for

11

1  | assessment and care of inmates at Intake/Receiving in the jail. Bernal Dec. ¶¶5-7; Bass Dec.

2  | ¶¶4-7, Ex. D. By May 2015, a settlement agreement had been signed and approved by the court

3  | in *Hernandez v. Cty. of Monterey*, N.D. Cal. Case. No. 13-cv-2354-PSG ("*Hernandez*"),

4  | outlining parameters for the resolution of issues raised in that litigation. *Hernandez* ECF 483,

5  | 485. Commander Thornburg and Captain Bass attended briefings for custody staff in 2015 (and

6  | thereafter), where custody staff were advised and trained on new procedures, as well as the

7  | increased involvement of CFMG medical staff in response to the *Hernandez* litigation. The

8  | County trained on new procedures even prior to the settled-upon protocols being formalized. For

9  | example, as a result of the County's February 2015 amended agreement with CFMG, by summer

10 | of 2015 new procedures were implemented in Intake/Receiving, and CFMG medical staff were

11 | on duty 24/7, with an exam area in the Intake/Receiving area. Bass Dec. ¶5.

12 |     The courts have long recognized that corrections officials are to be afforded considerable

13 | discretion in determining best practices for balancing legitimate custodial priorities and the needs

14 | of inmates. *Bell v. Wolfish*, 441 U.S. at 540, 547; *see also Anderson v. County of Kern*, 45 F.3d

15 | 1310, 1315 (1995). As a general matter, courts ordinarily defer to the expert judgments and

16 | professional expertise of corrections officials. *Bell*, 441 U.S. at 547-48.

17 |     Plaintiffs cannot successfully argue that custody officers should have been better

18 | supervised or trained on recognizing and responding to serious medical needs than were the

19 | CFMG health care professionals who assessed Ms. Gillis at least 20 times December 4 to 5,

20 | 2015. The repeated assessments December 4 and 5, 2015 by CFMG health care professionals, as

21 | noted on Ms. Gillis' Safety Cell Log (available to custody staff), included the repeated

22 | "Recommendation" to "maintain." Sievers Dec, Ex. C, pp. 1-5 (middle of pages). Moreover,

23 | there is no evidence whatsoever of negligence in hiring or retention by the County or Bernal.

24 |     The undisputed evidence demonstrates Plaintiffs are unable to make a sufficient showing

25 | to prevail on their State law claim of negligent supervision, training, hiring and retention against

26 | Sheriff Steve Bernal and the County of Monterey. Therefore, the seventh claim for relief must be

27 | dismissed against defendants County of Monterey and Sheriff Steve Bernal.

28 |

12

1            **E. State Law Wrongful Death**

2            Plaintiffs assert a claim for wrongful death based on allegations of failure to summon

3 medical care. ECF, 1¶¶150-153. As set forth above, the California Government Code generally

4 precludes tort liability, except as prescribed therein.

5            The elements of a California wrongful death tort claim are: "(1) a 'wrongful act or neglect'

6 on the part of one or more persons that (2) 'cause[s]' (3) the 'death of [another] person.'" *Norgart v.*

7 *Upjohn Co.,* 21 Cal.4th 383, 390 (1999) (quoting Cal. Civ. Proc. Code § 377.60). "A wrongful death

8 claim may be predicated on negligence or other tortious conduct." *Prasad*, 958 F. Supp. 2d 1101,

9 1118 (E.D. Cal. 2013).

10            California Government Code section 845.6 provides that generally neither a public entity

11 nor a public employee is liable for injury resulting from "the failure of [a public] employee to

12 furnish or obtain medical care for a prisoner in his custody." Cal. Gov. Code § 845.6. The statute

13 provides an exception "if the employee knows or has reason to know that the prisoner is in need

14 of immediate medical care and he fails to take reasonable action to summon such medical care".

15 *Id.* California courts have narrowly interpreted section 845.6 to create limited liability when: (1)

16 the public employee "knows or has reason to know of the need," (2) of "immediate medical

17 care," *and* (3) "fails to take reasonable action to summon such medical care." *Castaneda v.*

18 *Department of Corrections & Rehabilitation*, 212 Cal. App. 4th 1051, 1070 (2013), *review*

19 *denied* (May 1, 2013). "Liability under section 845.6 is limited to serious and obvious medical

20 conditions requiring immediate care." *Watson*, 21 Cal. App. 4th at 841. It does not impose a

21 duty to monitor the quality of care provided. *Id.* at 843. "[S]ection 845.6 creates out of the

22 general immunity a limited cause of action against a public entity for its employees' failure to

23 *summon* immediate medical care only. . . . The statute does not create liability of the public

24 entity for malpractice in furnishing or obtaining that medical care." *Castaneda*, 212 Cal. App.

25 4th at 1070 (emphasis in original).

26            In addition, California Government Code section 855.6 provides: "Except for an

27 examination or diagnosis for the purpose of treatment, neither a public entity nor a public

28 employee acting within the scope of his employment is liable for injury caused by the failure

13

1 to make a physical or mental examination, or to make an adequate physical or mental
2 examination, of any person for the purpose of determining whether such person has a disease
3 or physical or mental condition that would constitute a hazard to the health or safety of
4 himself or others."

5      It is undisputed that defendant California Forensics Medical Group (CFMG) staff were
6 on site in the Intake/Receiving area where Ms. Gillis was housed at all pertinent times, and had
7 the responsibility and opportunity to observe, assess, and provide medical care and treatment at
8 all times. CFMG staff, accompanied by custody staff, observed Ms. Gillis at least 20 times. The
9 repeated conclusions by CFMG health care professionals noted on Ms. Gillis' Safety Cell Log
10 (available to custody staff) were to "maintain" her in the safety cell. Sievers Dec, Ex. C, pp. 1-5
11 (middle of pages). Moreover, there is no evidence of any serious and obvious medical
12 conditions requiring immediate care that should have been recognized by custody staff and were
13 ignored or not addressed by Moving Defendants. Therefore, no liability for wrongful death can
14 attach to any Moving Defendant; and summary judgment should be granted as to these claims.

15      **F. General Negligence Claim Under State Law**

16      Plaintiffs' eleventh claim for relief assert general negligence against all defendants, based
17 on allegations of failure to summon or provide adequate medical care, and failure to adopt
18 policies, procedures and training to ensure such care. Liability may attach on a negligence basis
19 if custody staff committed acts which increased the risk of harm to Ms. Gillis. *Benavidez v. San*
20 *Jose Police Dept.*, 71 Cal. App. 4th 853, 865 (1999). The analysis under California Government
21 Code section 845.6 parallels that of the wrongful death claim set forth above. Where, as here,
22 custody staff relied upon CFMG medical staff, who assessed and checked repeatedly on Ms.
23 Gillis, no liability for negligence can attach.

24 **III. UNDISPUTED FACTS SUPPORTING SUMMARY JUDGMENT**

25      Because Plaintiffs must present evidence demonstrating facts of a link, or causal
26 connection, between *each* defendant's actions or omissions and a violation of Gillis' federal
27 rights as State law claims (*Lemire*, 726 F.3d at 1074-75; *Starr v. Baca*, 652 F.3d 1202, 1205-08
28

14

1   (9th Cir. 2011)), pertinent facts supporting summary judgment on Plaintiffs' claims against each

2   Moving Defendant are set forth separately below.

3   **A. Facts Pertinent to All Custody Defendants**

4   While assigned to work at the Monterey County Jail, custody staff received at least

5   biannual training on, among other topics, custody procedures, care and safety concerns for

6   inmates, policies and procedures on services for inmates, including classification and housing,

7   food and drink, medical care, identifying signs of immediate medical and mental health needs of

8   inmates, and emergency medical response. Decs. Mendoza, Sanchez, Wong, Raarup, ¶¶3. At all

9   pertinent times, custody staff received training on all policy and procedure changes, and after the

10  *Hernandez* litigation settlement parameters were outlined, they received updated information

11  about custody procedures and protocols. Id. By December 2015, CFMG provided 24/7, around

12  the clock medical personnel assigned in the Intake/Receiving area to assess and provide medical

13  care to inmates, as appropriate. A CFMG nurse was stationed in the Intake/Receiving area for

14  Intake assessments and for care and treatment of inmates in the Intake/Receiving area, including

15  Ms. Gillis in the safety cell, at all times in December 2015. Id.; Bass Dec. ¶¶4-7, Ex. D

16  In 2015, it was not the practice of custody staff in the Intake/Receiving area where Ms.

17  Gillis was housed, to record every instance of food and water being provided in the Safety Cell

18  Log, but instead to note in the 24 Hour Log if the offers of food were refused. For this reason,

19  the Safety Cell Log for Ms. Gillis for December 4 to5, 2015 does not include a written record of

20  every time food and water were provided, or refused. Custody deputies' best recollection are

21  that food and water were indeed provided at the regularly scheduled intervals, and were accepted

22  by Ms. Gillis, unless otherwise noted on the 24 Hour Log. Decs. Mendoza, Sanchez, Wong,

23  Raarup, ¶¶4, Dec. Sievers ¶¶4-5.

24  By December 1, 2015, the *Hernandez* protocols pertinent to Ms. Gillis detention were

25  largely in place, and medical staff was available in the booking area was available at all times.

26  Therefore, custody officers deferred to the CFMG medical staff on medical matters related to

27  inmates. In the event of a concern about an immediate serious medical need, however, custody

28

15

1    officers were each authorized to call 911 and arrange for hospital transport, even without medical

2    staff input. Decs. Mendoza, Sanchez, Wong, Raarup, ¶¶5; Bernal Dec ¶7; Bass Dec. ¶7.

3          **B. Deputy Jennifer Mendoza**

4          Jennifer Mendoza worked for the Office of the Sheriff/Coroner beginning in March 2005.

5    She served as a Field Training Officer in the receiving area at the jail in the 2008 to 2009 time

6    frame. Mendoza Dec. ¶2. In December 2015, Mendoza was familiar with Ms. Gillis, as an

7    inmate, from her prior incarcerations.  Mendoza had encountered her on eight to ten prior

8    incarcerations.  December 4, 2015, Mendoza was working in Jail Receiving when Ms. Gillis

9    arrived in a CSUMB patrol vehicle.  Ms. Gillis' appearance and status on her arrival were quite

10    similar to her behavior on these previous incarcerations, based on her experience; consistent with

11    a person on a stimulant of some type.  Ms. Gillis was combative, yelling and animated.  When

12    the CSUMB deputies opened their patrol vehicle to bring her into the booking area, Ms. Gillis

13    broke away, and ran toward the large opening to the sally port, where another vehicle had just

14    entered.  Officers had to chase her to prevent her escape.  Id ¶6.

15          Because of Ms. Gillis' escape attempt and her combative behavior, the receiving deputies

16    made the decision to place Ms. Gillis in a safety cell.  This was done for her safety, and the

17    safety of other inmates and staff.  Id. ¶7.

18          After Ms. Gillis was in the safety cell, in the presence of a CFMG nurse, Mendoza

19    conducted the pat-down search of Ms. Gillis.  Mendoza did not notice any bruising, cuts or

20    injuries, and there was nothing abnormal in her breathing.  Ms. Gillis continued to be combative

21    and animated.  Mendoza had no knowledge of any medical or mental health diagnoses of Ms.

22    Gillis; this was not unusual in Mendoza's experience, given HIPAA and privacy laws. Id. ¶8.

23          As reflected in the Safety Cell Log (Sievers Dec. Ex.C), Mendoza conducted safety

24    checks on Ms. Gillis at least nine times during her shift on December 4, 2015. CFMG medical

25    staff also conducted assessments, and noted on the Safety Cell Log that Ms. Gillis should be

26    maintained in the safety cell.  Most of the time when Mendoza checked on Ms. Gillis, she was

27    standing at the door.  Mendoza Dec. ¶9.

28

16

1  Mendoza was not on duty in the receiving area where Ms. Gillis was housed on
2  December 5, 2015.  Based on her personal observations of Ms. Gillis at the jail in December 4,
3  2015, and based on Mendoza's training and experience, Mendoza never had any concerns about
4  a serious medical condition that required immediate attention for Ms. Gillis.  To the contrary,
5  Mendoza found Ms. Gillis' condition to be consistent with observations during her previous
6  incarcerations when Mendoza worked at the jail. If Mendoza had had any concerns about a
7  serious medical condition for Ms. Gillis during her December 2015 stay at the jail, she would
8  have immediately summoned CFMG medical staff, who were on site at all times. Id. ¶10.

9  **C. Officer Pete Sanchez**

10  Sergeant Pedro "Pete" Sanchez earned a Bachelor of Science degree in justice studies
11  from San Jose State University.  He has worked with the Office of the Sheriff/Coroner since
12  2007. Sanchez Dec. ¶¶2-3.

13  As with Mendoza, in December 2015, Sanchez was familiar with Ms. Gillis, as an
14  inmate, from her prior incarcerations.  He was working as a Sergeant at the jail when Ms. Gillis
15  arrived at the jail on the morning of December 4, 2015.  He recalled Ms. Gillis was highly
16  agitated, very animated, twisting and turning, and trying to break free of the deputies who were
17  escorting her to the safety cell.  Ms. Gillis was yelling and screaming, so he assumed her
18  breathing must have been fine.  He did not see any injuries.  Id ¶7.

19  Based on Sanchez's observations of Ms. Gillis' combative behavior, and the observations
20  of the receiving deputies, Sanchez signed off on Ms. Gillis' placement in the safety cell on
21  December 4, 2015, for the protection of herself and others.  A nurse was present at the time of
22  Ms. Gillis' placement in the safety cell on December 4, 2015. Id, ¶8.

23  As reflected in the Safety Cell Log (Sievers Dec., Ex. C), CFMG nurses assessed Ms.
24  Gillis repeatedly December 4 and 5, 2015, and recommended she be maintained in the safety
25  cell. Sanchez observed her in the safety cell at least eight times between December 4 and 5,
26  2015, and never observed any indications of a serious medical condition prompting a request for
27  additional medical care.  Id. ¶9.

28

17

1    During his duty when Ms. Gillis was at the jail on December 4 and 5, 2015, and based on

2 his training, experience and observations, Sanchez never had any concerns about a serious

3 medical condition that required immediate attention for Ms. Gillis.  To the contrary, her

4 condition appeared to be consistent with Sanchez's observations during her previous

5 incarcerations when he worked at the jail.  If Sanchez had had any concerns about a serious

6 medical condition for Ms. Gillis during her December 2015 stay at the jail, he would have

7 immediately summoned CFMG medical staff, who were on site at all times. Id. ¶10.

8        **D.  Deputy Wesley Wong**

9    Wesley Wong has worked in the Office of the Sheriff/Coroner in the Jail since 1989.

10 Wong Dec. ¶2

11    In December 2015, Wong was also familiar with Ms. Gillis, as an inmate, from her prior

12 incarcerations.  December 4, 2015, he was working in Jail Receiving when Ms. Gillis arrived in a

13 CSUMB patrol vehicle.  Ms. Gillis was belligerent and uncooperative.  She was resisting the

14 officers and talking a lot.  Wong did not recall observing any injuries or other need for medical

15 care for Ms. Gillis when she arrived at the jail on the morning of December 4, 2015 Id. ¶¶6-7.

16    As reflected in the Safety Cell Log, Wong conducted safety checks on Ms. Gillis twice

17 during his shift on December 4, 2015, at approximately 9:30 a.m. and 12:45 p.m. CFMG medical

18 staff also conducted assessments, and noted on the Safety Cell Log that she should be maintained

19 in the safety cell.  The first time Wong checked on Ms. Gillis, she was at the cell door; the

20 second time, Wong noted she was talking.  Other deputies completed all of the other required

21 safety checks during his shift on December 4, 2015.   Wong was not on duty December 5, 2015

22 and did not see Ms. Gillis after his December 4, 2015 shift ended at approximately 4:00 p.m. that

23 day.  Id. ¶8.  Ms. Gillis was checked on many times by CFMG medical staff after Wong's last

24 check on December 4, 2015.  Sievers Dec., ¶9, Ex. B.

25    During his duty when Ms. Gillis was at the jail on December 4, 2015, and based on his

26 training, experience and observations, Wong never had any concerns about a serious medical

27 condition that required immediate attention for Ms. Gillis.  To the contrary, Wong found her

28 condition consistent with his observations during her previous incarcerations when he worked at

18

the jail. If Wong had had any concerns about a serious medical condition for Ms. Gillis during her December 2015 stay at the jail, he would have immediately summoned CFMG medical staff, who were on site at all times. Id ¶9.

### E. Deputy Douglas Raarup

Douglas Raarup has worked as a Deputy Sheriff since 2000. Raarup Dec ¶2. December 4, 2015, Raarup was assigned and working in Jail Receiving when Ms. Gillis arrived in a CSUMB patrol vehicle. Deputy Wong and Deputy Mendoza briefed Raarup on her behavior from what they remembered of Ms. Gillis from prior incarcerations. Raarup observed Ms. Gillis was combative, yelling and animated. Id. ¶6. Raarup did not notice any bruising, cuts or injuries, and she did not appear to need immediate medical care. He had no knowledge of any medical or mental health diagnoses of Ms. Gillis. This was not unusual in his experience, given HIPAA and privacy laws. Id. ¶8. He conducted safety checks on Ms. Gillis more than ten times between 8:30 a.m. and 3:19 p.m. during his shift on December 4, 2015. CFMG medical staff also conducted assessments, and noted on the Safety Cell Log that she should be maintained in the safety cell. Most of the time, she was standing at the door and/or talking. Id. ¶9. Ms. Gillis was checked on many times by CFMG medical staff after Raarup's last check on December 4, 2015. Sievers Dec., ¶9, Ex. B.

When Ms. Gillis was at the jail in December 2015, and based on Raarup's training, experience and observations, Raarup never had any concerns about a serious medical condition that required immediate attention for Ms. Gillis. To the contrary, her condition appeared to be consistent with observations during her previous incarcerations. If Raarup had had any concerns about a serious medical condition for Ms. Gillis during her December 2015 stay at the jail, he would have immediately summoned CFMG medical staff, who were on site at all times. Id. ¶10.

### F. Sheriff Steve Bernal

Steve Bernal has been employed with the County of Monterey, Office of the Sheriff since 1999. He served as a deputy both in the Jail, and most of the time on Patrol. In 2014, he was elected Sheriff/Coroner, and was sworn in as Sheriff in December 2014. Bernal Dec. ¶2. During his tenure as Sheriff/Coroner, custody staff received regular training on, among other topics,

19

custody procedures, care and safety concerns for inmates, policies and procedures on services for
inmates, including classification and housing, food and drink, medical care, identifying signs of
immediate medical and mental health needs of inmates, and emergency medical response. In
addition, the department has routinely provided training on updates on all policy and procedure
changes, in particular at the jail. Id. ¶¶3-4.

   After the *Hernandez* litigation settlement parameters were outlined in May 2015, the
Office of the Sheriff/Coroner ("Office") and CFMG were involved in the development and
implementation of changes in policies and procedures pertaining to the following: (a) CFMG
medical staff would conduct the initial evaluation to determine if an inmate is intoxicated and/or
suffering from withdrawal or at high risk for withdrawal; (b) CFMG medical staff could make
the decision on who should be placed in a sobering cell or who should be transferred to the
hospital to be treated for possible or actual withdrawal; (c) CFMG medical providers (physicians,
physicians assistants, and/or nurse practitioners) were to be timely involved in assessing and
treating inmates potentially undergoing withdrawal, and non-provider medical staff shall timely
refer to providers those inmates undergoing withdrawals when clinically indicated; (d)
Detoxifying inmates shall be adequately monitored by CFMG medical staff using the CIWA
protocol or equivalent validated monitoring protocol, shall receive pharmacological treatment by
CFMG as indicated and be appropriately housed based on their clinical conditions; (e) CFMG
shall develop separate treatment protocols for CFMG monitoring and treatment for opiate,
alcohol and benzodiazepine withdrawal. Id. ¶5.

   After the *Hernandez* litigation settlement parameters were outlined, the Office provided
updated information for all persons assigned to work at any time in the jail about changes and
improvements in custody procedures and protocols. In February 2015, the County approved an
increase in the contract for CFMG, and expanded the scope of services CFMG provided for
medical and mental health care at the jail. By December 2015, CFMG provided 24/7, around the
clock medical personnel assigned in the Intake/Receiving area to assess and provide medical care
to inmates, as appropriate. A nurse was stationed in the Intake/Receiving area for Intake

1   assessment and for care and treatment of inmates in the Intake/Receiving area, including Ms.

2   Gillis in the safety cell, at all times in December 2015. Id. ¶6.

3          By December 1, 2015, the *Hernandez* protocols pertinent to the Ms. Gillis' incarceration

4   were generally in place at the jail, and medical staff were stationed and monitoring inmates as

5   needed in the Intake/Receiving area at all times.  Therefore, custody officers in the

6   Intake/Receiving area generally deferred to the CFMG medical staff on medical matters related

7   to inmates.  In the event of a concern about an unaddressed immediate serious medical need,

8   however, custody personnel were each authorized to call 911 and arrange for hospital transport,

9   even without medical staff input.  Id. ¶7.

10         To the best of his knowledge, Sheriff Bernal never met Ms. Gillis.  He was not on site at

11  the jail on December 4 or 5, 2015, when Ms. Gillis was apparently there.  He has had no personal

12  knowledge of Ms. Gillis or her medical condition at any time.  As a result, Sheriff Bernal never

13  had any concerns about a serious medical condition that required immediate attention for Ms.

14  Gillis.  Id. ¶8.

15         **G.  County of Monterey**

16         At all times pertinent here, the County provided appropriate training for custody staff,

17  including regular  training on, among other topics, custody procedures, care and safety concerns

18  for inmates, policies and procedures on services for inmates, including classification and

19  housing, food and drink, medical care, identifying signs of immediate medical and mental health

20  needs of inmates, and emergency medical response.   Custody staff received training on updates

21  on all policy and procedure changes, and after the *Hernandez* litigation settlement parameters

22  were outlined in May 2015 (*Hernandez* ECF 483, 485), they received updated information about

23  custody procedures and protocols. Decs. Mendoza, Sanchez, Wong, Raarup, ¶¶3; Bass Dec. ¶5;

24  Bernal Dec. ¶¶3-7.

25         In advance of the *Hernandez* litigation settlement parameters being finalized in May

26  2015, in February 2015, the County approved an increase in the contract for CFMG, and

27  expanded the scope of services CFMG provided for medical and mental health care at the jail,

28  including assigning a registered nurse 24/7 to provide medical assessments and care for inmates

21

in Intake/Receiving. Bass Dec. ¶4. Captain Bass and Commander Thornburg attended briefings for custody staff in 2015 and thereafter, where custody staff were advised and trained on new procedures, as well as the increased involvement of CFMG medical staff in response to the *Hernandez* litigation. They trained on new procedures even prior to the settled-upon protocols were formalized. For example, as a result of the amendment to the County's agreement with CFMG, by Summer of 2015 new procedures were implemented in Intake/Receiving, and CFMG medical staff were on duty 24/7, and had an exam area in the Intake/Receiving area. Bass Dec. ¶5.

After the *Hernandez* litigation settlement parameters were outlined in May 2015, in Summer of 2015, the Office of the Sheriff/Coroner ("Office") and CFMG were involved in the development and implementation of changes in policies and procedures pertaining to the following, among other things: (a) CFMG medical staff to conduct the initial evaluation to determine if an inmate is intoxicated and/or suffering from withdrawal or at high risk for withdrawal; (b) CFMG medical staff shall make the decision on who should be placed in a sobering cell, or be transferred to the hospital to be treated for possible or actual withdrawal; (c) CFMG medical providers (physicians, physicians assistants, and/or nurse practitioners) shall be timely involved in assessing and treating inmates potentially undergoing withdrawal, and non-provider medical staff shall timely refer to providers those inmates undergoing withdrawals when clinically indicated; (d) Detoxifying inmates shall be adequately monitored by CFMG medical staff using the CIWA protocol or equivalent validated monitoring protocol, shall receive pharmacological treatment by CFMG as indicated and be appropriately housed based on their clinical conditions; (e) CFMG shall develop separate treatment protocols for CFMG monitoring and treatment for opiate, alcohol and benzodiazepine withdrawal. Bass, Bernal Decs. ¶¶6.

By the time of Ms. Gillis' incarceration in December 2015, CFMG provided 24/7 (around the clock) medical personnel assigned in the Intake/Receiving area to assess and provide medical care to inmates, as appropriate. A nurse was stationed in the Intake/Receiving area for Intake assessment and for care and treatment of inmates in the Intake/Receiving area, including Ms. Gillis in the safety cell, at all times in December 2015. The *Hernandez* protocols pertinent to the

1  Gillis litigation were generally in place at the jail, and medical staff were stationed and

2  monitoring inmates as needed in the Intake/Receiving area at all times. Therefore, custody

3  officers in the Intake/Receiving area generally deferred to the CFMG medical staff on medical

4  matters related to inmates. In the event of a concern about an unaddressed immediate serious

5  medical need, however, custody personnel were each authorized to call 911 and arrange for

6  hospital transport, even without medical staff input. Bass Dec. ¶7.

7  If Plaintiffs rely on *Hernandez* to establish deliberate indifference to Ms. Gillis' medical

8  needs, their reliance is misplaced. As set forth above, the undisputable evidence cited above

9  demonstrates that the County had implemented significant changes and improvements by the

10  time of Ms. Gillis' subject incarceration. Moreover, CFMG medical professionals not only were

11  stationed at Ms. Gillis' location, they assessed her and checked on her at least 20 times in less

12  than 28 hours. Sievers Dec. ¶9. Thus, there is no causal connection between any prior

13  *Hernandez* policies, practices or conditions and Ms. Gillis' unfortunate outcome in December

14  2015.

15  **VI. CONCLUSION**

16  The undisputed facts demonstrate that Moving Defendants had no knowledge, nor should

17  they reasonably have possessed knowledge, of any serious medical need of Ms. Gillis that

18  required immediate attention during her incarceration December 4 or 5, 2015. Nor did Moving

19  Defendants respond unreasonably to any apparent condition of Ms. Gillis. To the extent that

20  Plaintiffs contend a constitutional violation can be demonstrated, Moving Defendants submit that

21  qualified immunity must shield them from liability because Plaintiffs cannot cite well established

22  law requiring them to act differently than they did under the circumstances. Moreover, as

23  CFMG medical personal were assigned and working in the unit where Ms. Gillis was housed in

24  the safety cell at all times December 4 to5, 2015, conducted at least twenty checks of Ms. Gillis

25  including "Medical Assessment[s]", and entered on the Safety Cell Log their "Recommendation"

26  that Ms. Gillis be "maintain[ed]" several times and at 11:30 a.m. December 5, 2015, no liability

27  for deliberate indifference can attach. As no individually named County defendant can be found

28

23

1 | deliberately indifferent, no *Monell* liability should attach. With respect to State law causes of
2 | action, the immunities preclude liability, as set forth above.

3 |       As unfortunate an outcome as Ms. Gillis suffered after her December 4 to 5, 2015 stay at
4 | the Monterey County jail, the outcome does not, ipso facto, establish any liability on the part of
5 | Moving Defendants. The undisputed facts compel summary judgment be granted here because
6 | Moving Defendants reasonably relied on the presence and efforts of health care professionals
7 | assigned to assess and tend to medical needs of Ms. Gillis and the other inmates cycling through
8 | the Intake/Receiving area.

10 | Dated: May 31, 2018

11 |                                         CHARLES J. McKEE
                                         County Counsel

14 | By_____
   IRVEN L. GRANT, Deputy County Counsel
15 | Attorneys for Defendants COUNTY OF
   MONTEREY, SHERIFF STEVE BERNAL,
16 | DEPUTY J. MENDOZA, OFFICER P. SANCHEZ,
   DEPUTY WONG, and DEPUTY DOUGLAS
17 | RAARUP

24