```
 1              UNITED STATES DISTRICT COURT
 2             NORTHERN DISTRICT OF CALIFORNIA
 3                    SAN JOSE DIVISION
 4
 5   BRANDON VILLARREAL, a minor by and
     through his guardian ad litem, DONALD
 6   VILLARREAL and JAMES GREGORY individually
     and as the Successor in Interest of the
 7   Estate of Larra Ann Gillis,
 8            Plaintiffs,
 9   v.                                No. 16-cv-06672 LHK
10   COUNTY OF MONTEREY; SHERIFF STEVE BERNAL,
     in his individual and official capacity,
11   DEPUTY J. MENDOZA; OFFICER P. SANCHEZ;
     DEPUTY WONG; DEPUTY DOUGLAS RAARUP; CITY
12   OF MARINA; CALIFORNIA FORENSIC MEDICAL
     GROUP; TAYLOR FITHIAN, M.D.; LORI EDWARDS,
13   R.N. and DOES 1 to 100, inclusive,
14            Defendants.
15   _____
16            DEPOSITION OF JEFFREY S. CARTER
17                 Emeryville, California
18                  Monday, May 7, 2018
19                       Volume 1
20
21
22
     Reported by:
23   KELLY WILLIAMS
     CSR No. 6442
24   JOB No. 2904591
25   PAGES 1 - 151
```

Page 1

1  an opinion, an expert opinion?  You've got to have some
2  expertise demonstrated.  Anybody could read something
3  out of the court decision.  This is just kind of a
4  statement out of a court decision, right?
5      A.   Yes, sir; but what I'm saying here is that
6  pointing out the fact that since April 1 of 2015, this
7  was -- this was the practice that was supposed to be
8  followed.
9      Q.   Okay.  As far as this goes, to be followed by
10 members of California Forensic Medical Group, correct?
11     A.   Yes, sir, in that statement.
12     Q.   All right.
13     A.   And it sets up a foundation for 37.
14     Q.   So what you believe was to occur was that
15 every time an inmate or detainee was brought into the
16 jail that they would first go through a medical
17 screening to be completed by medical staff, right?
18     A.   Yes, sir.
19     Q.   And then they could be placed in a cell or
20 housed or whatever after that?
21     A.   Depending on what the outcome of -- that, plus
22 other elements, yes.
23     Q.   Did you contemplate at all what happens if the
24 inmate comes in or detainee comes in and is combative
25 like Ms. Gillis was?

```
 1        A.   Yes, sir, I did.
 2        Q.   Would your thought be that no matter what, the
 3   first thing that has to happen is she has to get that
 4   medical screening?
 5             MS. SANGUINETTI:  Objection.  Vague and
 6   ambiguous.
 7             THE WITNESS:  I'm not saying there can't be
 8   exceptions to that, but the medical screening needs to
 9   take place as soon as possible.
10             MR. GRANT:  Q.  Okay.  So you don't have a
11   problem with if an inmate or detainee comes in that's
12   combative that they are placed in some is type of cell
13   for their own security, their own safety and that of the
14   people in the institution first and then the medical
15   screening proceeds?
16             MS. SANGUINETTI:  Objection.  Incomplete
17   hypothetical, vague and ambiguous.
18             MR. GRANT:  I think he gets the point.
19             MS. SANGUINETTI:  Answer if you can.
20             THE WITNESS:  The -- that's a case-by-case
21   scenario depending on the situation.  The importance of
22   the medical screening is one, whether the facility is
23   going to even accept the inmate.  That, I didn't think
24   happened in this case.
25             MR. GRANT:  Q.  What didn't happen?
```

```
 1        A.   That they accepted -- that the screening was
 2   to whether -- making a decision as to whether they were
 3   even going to accept the inmate because depending on
 4   their medical needs, the facility could have turned the
 5   inmate away.
 6        Q.   They had discretion, correct?
 7        A.   And adheres --
 8        Q.   They had discretion, correct?
 9        A.   Well, yes.  I don't know if the discretion was
10   with the officers or the command staff.  In this case,
11   the officers made that call.
12        Q.   Okay.
13        A.   From what I see in deposition, actually, the
14   sergeant was the one who signed off saying yes, this is
15   what we're going to do, but the actual decision that was
16   made was made by three corrections officers that was
17   dealing with Ms. Gillis.
18        Q.   Okay.
19        A.   And they accepted her in; and based on that
20   decision also, the decision was made to place her in
21   this cell bypassing medical of which based on
22   Ms. Nieman's testimony occurs commonly.
23        Q.   Well, maybe it does; maybe it doesn't; but in
24   this particular instance, would you consider it be a
25   violation of best practices to -- not -- to have put her
```

```
 1   in the safety cell first and then done the medical
 2   examination --
 3             MS. SANGUINETTI:  Objection --
 4             MR. GRANT:  Q.  -- or would you have
 5   her somehow do the medical examination while she's
 6   screaming and yelling and fighting out in the receiving
 7   area?
 8             MS. SANGUINETTI:  Objection.  Compound, vague
 9   and ambiguous.
10             THE WITNESS:  That depends on how fast a
11   proper medical assessment can be completed.  If the
12   practice is looking through a glass as the medical
13   assessment, in my opinion, that's not acceptable enough;
14   therefore, it should have been done as she was being
15   brought in.
16             MR. GRANT:  Q.  You're now giving us your
17   medical opinion?
18        A.   No, I'm just talking about a medical
19   assessment.  A proper medical assessment should be done
20   based on their policy and procedure as to what they say
21   is a medical assessment.
22        Q.   Who is they says is?  Who are we talking
23   about?  Custodial staff?  California Forensic?
24        A.   You would compare both policies and procedures
25   depending on which one relates to it or if both do.
```

Page 47

```
 1   the one that is to do that.
 2        Q.   In the first sentence, sir, you're talking
 3   about an assessment that is to be done by Nurse Newman,
 4   right?
 5        A.   Yes, sir.
 6        Q.   Nieman.  Okay.  In the second sentence you're
 7   now talking about practices or policies and procedures
 8   of the jail staff, of the sheriff's department?
 9        A.   Yes, sir.  In their policies and procedures it
10   states what are the things at minimum of what will be
11   checked for in that medical assessment.
12        Q.   Are you saying that what that check -- that
13   that checklist is incomplete?
14        A.   No.  What I'm saying, sir, is those -- those
15   things appear to be not followed; that information was
16   not obtained.
17        Q.   So your commentary here is on the medical
18   assessment?
19        A.   I summarized what the -- what occurred and
20   based on the jail policies.
21        Q.   Are you -- are you not saying here that the
22   medical assessment was not adequate?
23        A.   Yes, sir, it was not -- it was not following
24   the policy.
25        Q.   So when you say the last sentence "Per the
```

Page 70

```
 1   policies and procedures of the sheriff's office,"
 2   right --
 3        A.   Yes, sir.
 4        Q.   -- this was not an adequate assessment, you're
 5   talking about the medical assessment that was done by
 6   looking through the window of the jail cell?
 7        A.   Yes, sir, it doesn't follow the policies that
 8   the sheriff's office has laid down as to what is to be
 9   looked for whenever an inmate comes in the door.
10        Q.   So this is not a critique on the policies of
11   the department, sheriff's office or department one way
12   or the other; it's a critique on the assessment done by
13   the medical staff?
14        A.   Well, the policies is there in place, and the
15   assessment was not completed as it states in the
16   sheriff's policy.
17        Q.   And that should have been completed by the
18   medical staff, correct?
19        A.   The medical staff is responsible for
20   completing that assessment.  At the time, the policy
21   was -- at the time and place on December, the actual
22   written policy stated that the correctional officer will
23   make that assessment, but that was supposed to change.
24        Q.   But you know as a matter of practice, at least
25   three or four of the deputies who testified in their
```

Page 71

```
 1   whatever reason.  The importance of those was again
 2   placed in Dr. Fithian and Nurse Nieman's deposition.  So
 3   you utilize every tool possible in order to see if you
 4   can get cooperation from the inmate.
 5           MR. GRANT:  Q.  Do you believe it's the --
 6   under our policies that you've referenced here that the
 7   CIT team is brought in to replace the medical staff?
 8       A.   No, sir, just another tool in the box.
 9       Q.   What does that mean, sir?
10       A.   A resource that you can actually go to utilize
11   to see if it works, you use everything that you can
12   inside of facilities to maintain proper order and get
13   things completed that need -- per policy that they need
14   to be completed.
15       Q.   Okay.  So let's take a look at paragraph 54 if
16   you would.
17       A.   Fifty-four?
18       Q.   Uh-huh.
19       A.   Okay.
20       Q.   In the third line you talk about opening a
21   flap?
22       A.   Yes, sir.
23       Q.   What flap are you talking about?
24       A.   Well, some facilities utilize if an inmate is
25   inside the cell and they are banging on the door and
```

Page 103

```
 1    they're basically feeding on staff outside walking by
 2    and things like that, some facilities -- although, I
 3    don't recommend it, but some do put a flap over the top
 4    of the door where the inmate can't see out; and in order
 5    for staff to do their observation, they walk up to
 6    remove the flap over in order to look in; and based on
 7    the video, it appeared they had that flap inside or on
 8    Ms. Gillis' door.  They were moving something to look in
 9    and then moving it back.  So based on that movement, I
10    took that there was a flap or something over the top of
11    the door where they couldn't see.
12         Q.   Did you ever inquire, in fact, that there was
13    a flap over the door?
14         A.   No, sir, I did not.  I have not talked to
15    anyone at the Monterey County Jail.
16         Q.   Have you ever been shown a photograph of the
17    jail door itself?
18         A.   Just based on the video.
19         Q.   So you haven't seen or don't know what the
20    actual door looks like?
21              MS. SANGUINETTI:  Objection.  Vague and
22    ambiguous, misstates his testimony.
23              THE WITNESS:  The -- the -- those flaps are
24    removable; so whether it was a picture, that would
25    really not be relevant if I saw a picture of the door
```

Page 104

1   now based on the flap being there or not because those
2   flaps are normally removable; therefore, some inmates,
3   they will put those on, and some they don't; but in that
4   54, it was the observations that was my point that I was
5   looking at how long the observations were taking and
6   that some documented there in 54 was actually documented
7   on the sheet and no observation inside the cell was
8   noted on the video.  Even in one instance a deputy walks
9   up to the door who was escorting, I think, a social
10  worker, and the deputy is standing there at the door if
11  there wasn't some blind there to look in, the deputy
12  that's there working the floor stated don't look in
13  there, you don't want to look I think was his comment,
14  and then he does, and then he looks around at the
15  deputy, and the deputy laughs and says "I told you not
16  to look."  And that was problematic in my opinion.
17          MR. GRANT:  Q.  Which safety cell was that?
18      A.   That was in two.  That was Ms. Gillis' cell.
19      Q.   You said a moment ago -- I think you said that
20  there was a recording on this -- on a cell log, for
21  example, but there was no observation at that time?
22      A.   Yes, sir.  I've got those documented in 54.
23  On the video, what I could tell that the deputy walks up
24  to the door or walks up to the -- the observation sheet,
25  writes something on the observation sheet and then just

Page 105